ROCHESTER ROPES, Inc., Plaintiff,

v.

THE DANIELSON MANUFACTURING COMPANY, Defendant.

Civ. No. 3883.

United States District Court, D. Connecticut.

Jan. 15, 1954.

Arnold B. Christen, of Fisher & Christen, Washington, D. C., Lindsey & Prutzman, Hartford, Conn., for plaintiff.

Allan K. Smith, of Day, Berry & Howard, Hartford, Conn., Nathaniel Frucht, of Frucht & DellaGrotta, Providence, R. I., for defendant.

SMITH, Chief Judge.

This is an unfair competition action between two manufacturers of nylon covered wire ropes. The plaintiff, Rochester Ropes, Inc., seeks to enjoin the defendant, Danielson Manufacturing Company, from interfering with plaintiff's sales by threatening legal action against plaintiff's customers. Defendant in its counterclaim seeks to enjoin plaintiff from continuing the manufacture of its "wirelon" products, nylon covered wire ropes, which it claims were produced by the plaintiff in violation of disclosures of the method of manufacture made in confidence by defendant Danielson to the plaintiff Rochester during the period when Rochester was licensed by Danielson under pending patent applications.

Finding of Facts.

1. Defendant, a Connecticut corporation, had been a manufacturer of rawhide-covered impact hammers and loom parts known as pickers. When the supply of water buffalo rawhide was cut off during World War II, it sought to develop acceptable substitutes available in the United States. The DuPont Company, at defendant's request, eventually developed and produced a type of nylon suitable for use on the striking surfaces of the impact hammers and on the pickers.

2. Defendant thereafter tried out the coating with nylon of stranded wire cords.

3. The nylon was extruded on the cords starting about August 29, 1946 by a plastics concern on order of defendant, which had some experience in molded plastics, but had no extrusion equipment until its acquisition of a standard Hartig extruder in December 1947.

4. Dr. Fortner, then a DuPont employee, aided defendant in starting up the extruder in late December 1947 or early 1948.

5. Plaintiff, a New York corporation, is a manufacturer of wire ropes and cables with a manufacturing plant at Culpeper, Virginia.

6. Plaintiff and its predecessors have been engaged in this business for more than 50 years.

7. One Chadbourne, then an officer of the defendant and assignor to the defendant, applied for patents March 13, 1947 and November 27, 1947 for an improvement in the manufacture of thermoplastic articles.

8. These applications are still pending, some of the claims having been allowed, but appeal having been taken from unfavorable action on other claims.

9. The essence of the allowed claims is the extrusion of thermoplastic materials including nylon on a core such as a wire rope while the core is traveling at a speed relatively higher than the speed of extrusion of the plastic, to cause a pulling or stretching of the extruded

plastic sheath to bring about substantial orientation or longitudinal realignment of the molecules of the plastic, resulting in a strengthened and toughened plastic sheath and composite product.

10. On July 15, 1947, one Hotchkiss, a salesman of the plaintiff working in the northeastern section of the country, learned of the defendant's covering wire rope with nylon and called plaintiff's attention to the development.

11. Plaintiff was interested both in the possibility that defendant might be a customer for wire rope to be covered and a source of supply of the coated wire rope for some of plaintiff's yachting customers.

12. William L. Rochester, the president of the plaintiff, later in July 1947 arranged to visit the defendant's plant and discussed with defendant's representatives sales of wire rope to the defendant and the possibility of the plaintiff's manufacturing the covered rope under license from the defendant.

13. The defendant's representatives convinced the plaintiff that the method of extrusion used by the defendant, on which patent applications were pending, resulted in an oriented nylon sheath over the wire much tougher than the unoriented nylon.

14. Plaintiff and defendant agreed that plaintiff should take out a license under the defendant's patent applications, reaching agreement on the essential terms by October 1947 and formally entering into a license agreement April 1, 1948.

15. The agreement provided for a minimum annual royalty of $5,000 for a non-exclusive license terminable by the licensee on 6 months' notice.

16. Defendant arranged for a demonstration in October 1947 by representatives of DuPont at the DuPont laboratory at Arlington, New Jersey, to which plaintiff's representatives were invited, of the extrusion of nylon on wire rope.

17. At the demonstration the DuPont representatives furnished to the plaintiff the names of manufacturers of extrusion equipment, a number of whom were contacted by the plaintiff thereafter, and an extruder was purchased from the Hartig Machine Company which had been recommended by the DuPont representatives.

18. The plaintiff received the extruder about February 1948, and purchased about 700 pounds of DuPont nylon from the defendant which was later replaced by delivery to, defendant by DuPont of nylon ordered from DuPont by the plaintiff.

19. Plaintiff set up the extruder and built wire supply and take-off mechanisms and a cooling trough to go with the extruder.

20. On May 24, 1948 the plaintiff wrote asking the defendant to send a mechanic to be present at the starting of the plaintiff's machine as the defendant had earlier offered to do.

21. The extruder was placed in operation about May 25th or 26th, 1948.

22. A few days thereafter, two of the defendant's foremen, the Long Brothers, visited the plaintiff's plant at Culpeper, observed the operation of the machine on June 1st and 2nd, 1948 and made several suggestions to improve its operation, the principal ones being moving the cooling trough a few inches closer to the extruder head and loosening the tension somewhat on the take-off mechanism.

23. The suggestions were minor in nature and disclosed no substantial operating knowhow of any material assistance to the plaintiff.

24. Nothing was disclosed by defendant's representatives to the plaintiff then or at any other time as to the relative speeds of wire feed and extrusion.

25. The license agreement called for furnishing to the plaintiff power to inspect the patent applications.

26. The power was not, however, furnished until after the controversy which resulted in the suit arose.

27. Plaintiff's sales of nylon covered wire rope for the fiscal year ending May 1949 totalled $8,094.58; 1950, $33,885.23; 1951, $32,553.53.

28. Defendant's sales of nylon coated wire rope and cable in 1949 totalled $122,823, in 1950 $296,260, in 1951 $249,038, in 1952 $243,589.

29. Plaintiff paid the $5,000 minimum royalty for the first year of operation under the license commencing June 1, 1948.

30. Before the second royalty payment was due, however, plaintiff was complaining about the unprofitableness of the license agreement, and was also in controversy with defendant about defendant's payment of some $18,000 due from defendant to plaintiff for a special type of wire produced by plaintiff for defendant for use on a submarine signal order, delivery of which had not been accepted by the defendant after the manufacture of the wire by the plaintiff because of a breakdown in negotiations with the submarine signal people.

31. The parties eventually agreed that the license payments for the second and third years of the term of the license should be made by crediting the minimum royalty amount of $5,000 for each of those years upon the amount owed by defendant to plaintiff on account of the submarine signal order.

32. Plaintiff gave the defendant timely notice of termination of the license agreement November 27, 1950, six months before the end of the third royalty year.

33. Plaintiff thereafter continued to manufacture nylon covered wire ropes and cables and to sell them in competition with the defendant, although defendant demanded that plaintiff cease doing so and offered to purchase plaintiff's extrusion equipment.

34. Defendant also wrote to customers of plaintiff warning the customers that plaintiff was manufacturing the wire ropes and cables in violation of defendant's rights, threatening litigation, and offering to supply the customers itself.

35. The nylon covered cable made by plaintiff both before and after the termination of the license agreement has an outside diameter approximately identical with the size of the die opening.

36. The rate of extrusion of the nylon material onto the wire is approximately the same as the wire speed.

37. There is no appreciable stretching or orientation of the nylon sheath in plaintiff's process of manufacture caused by any differential between the speed of the wire and the rate of extrusion of the nylon material.

### Conclusions of Law

1. The Court has jurisdiction of the parties and subject matter of the action.

2. Plaintiff has established by a fair preponderance of the evidence baseless claims of infringement by plaintiff of defendant's rights in a manufacturing process, accompanied by threats of litigation made by defendant to plaintiff's customers.

3. Plaintiff is entitled to injunctive relief against continuation of such methods of unfair competition.

4. Defendant has failed to establish by a fair preponderance of the evidence the teaching of a manufacturing method in confidence to plaintiff and the use thereof by plaintiff.

5. Plaintiff is entitled to judgment dismissing the counterclaim.

### Discussion

Defendant had patent applications pending for an extrusion technique which it claimed resulted in an oriented nylon cover on the wire rope. It seeks to prevent plaintiff from continuing to use the technique after termination of plaintiff's license under defendant's applications.

To succeed, defendant would have to show that its technique was in some way different from normal extrusion techniques known in the trade at the time, and that the different method was made known in confidence to plaintiff.

Even if the method did not involve invention, but only improvements that a skilled mechanic could make, it still could be the basis of a confidential disclosure of operating knowhow, the abuse of which confidence would be unfair competition.

The difficulty here is that defendant has wholly failed to show any disclosure of method other than the then standard extrusion technique. Lacking such disclosure there is no basis for any agreement to hold anything in confidence.

Defendant appears to argue that the tests show that there must have been a unique method used, since plaintiff's product shows evidence of orientation of the nylon covering. The tests, however, are inconclusive as to the existence and extent of orientation, and the record lacks any substantial expert opinion that the orientation if present was caused by the relative speeds of wire feed and extrusion.

The patentability of the claims of the applications is not in issue here. We are concerned with alleged disclosures in confidence and use thereof after the permission which went with the license was terminated. Neither allegation is established by credible proof.

Plaintiff is entitled to judgment enjoining defendant from harassing plaintiff's customers, as prayed, and for judgment dismissing the counterclaim, with costs.

Form of judgment may be submitted on notice.